UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA


MARILYN G. MORGAN,                  )
                                    )
        Plaintiff,                  )
                                    )          No. 1:05-CV-205
v.                                  )
                                    )          *Edgar/Lee*
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )


## REPORT AND RECOMMENDATION

This action was instituted by the Plaintiff pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner" or "Defendant") denying the Plaintiff a period of disability, disability insurance

benefits ("DIB"), and supplemental security income ("SSI") under Title II and Title XVI of the

Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1382. This matter was referred to the

undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure

for a report and recommendation regarding the disposition of Plaintiff's motion for judgment on the

pleadings [Doc. No. 15] and Defendant's motion for summary judgment [Doc. No. 21].

For the reasons stated herein, it is **RECOMMENDED**: (1) the decision of the

Commissioner be **AFFIRMED**, (2) the Defendant's motion for summary judgment [Doc. No. 21]

be **GRANTED**, (3) the Plaintiff's motion for judgment on the pleadings [Doc. No. 15] be **DENIED**,

and (4) the case be **DISMISSED**.

**Administrative Proceedings**

Plaintiff applied for DIB on December 16, 2002, alleging disability since November 25, 2002 (Tr. 14, 63-65). On May 22, 2003, Plaintiff applied for SSI alleging disability since November 21, 2002 (Tr. 14, 506-09).[1] Plaintiff's applications for DIB and SSI were denied initially, upon reconsideration, and after a hearing and decision issued by the ALJ (Tr. 6-8, 11-23, 37, 39, 63, 506, 510, 514-41). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on May 3, 2005 (Tr. 6-8). Plaintiff timely sought review of the ALJ's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) [Doc. No. 3].

**Standard of Review**

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were unsupported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh

---

[1] Plaintiff also filed previous applications which were denied and not appealed (Tr. 34, 59, 87, 91).

the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted).

## How Disability Benefits Are Determined

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that disability claims are evaluated by way of a five-step sequential analysis. 20 C.F.R. § 404.1520. The five-step analysis is sequential because if, at any step, the claimant is found to be not disabled or to be disabled, then the claim is reviewed no further. 20 C.F.R. § 404.1520(a). The following are the five steps in the analysis:

Step 1: Is claimant engaged in substantial gainful activity? If so, claimant is not disabled. 20 C.F.R. § 404.1520(b).

Step 2: Does claimant have a "severe" impairment or combination of impairments

3

that significantly limits claimant's ability to do basic work activities, and will foreseeably result in death or last at least twelve months? If not, claimant is not disabled. 20 C.F.R. §§ 404.1509, 404.1520(c), 404.1521.

Step 3: Does the claimant's impairment meet or equal the criteria of an impairment described in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1? If so, the claimant is disabled, and the analysis may end without inquiry into the vocational factors. 20 C.F.R. § 404.1520(d). If inquiry is made into vocational factors, then after step three but before step four, the Commissioner evaluates a claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e)-(f); 404.1545.

Step 4: Does claimant's RFC permit claimant to perform claimant's past relevant work? If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f).

Step 5: Does the claimant retain the RFC to perform other work in the economy? If so, the claimant is not disabled. 20 C.F.R. § 404.1520(g).

The burden of proof is upon the claimant at steps one through four to show disability. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999). Once the claimant has demonstrated the extent of claimant's RFC at step four, the burden shifts to the Commissioner to show that there is work in the national economy that may accommodate claimant's RFC. *Id.*

### ALJ's Findings

The ALJ made the following findings in support of Commissioner's decision, which are conclusive if they are supported by substantial evidence in the record:

1. The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability (20 C.F.R. §§ 404.1520(b) and 416.920(b)).

3.   The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(c).

4.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

5.   The undersigned finds the claimant's allegations regarding her subjective limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 C.F.R. §§ 404.1527 and 416.927).

7.   The claimant has the residual functional capacity described above in the decision (20 C.F.R. § 404.1567 and § 416.967).

8.   The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

9.   The claimant is a younger individual (20 C.F.R. §§ 404.1563 and 416.963).

10.  The claimant has a seventh grade education with a high school equivalent degree (20 C.F.R. §§ 404.1564 and 416.964).

11.  Transferability of skills is not an issue in this case (20 C.F.R. §§ 404.1568 and 416.968).

12.  Considering a residual functional capacity for light work and the claimant's vocational factors, Rule 202.18 of Appendix 1, Subpart P, Regulations No. 4, directs a conclusion of "not disabled." There are a significant number of jobs in the national economy the claimant can perform.

13.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

(Tr. 21-22).

## Issues Presented by Plaintiff

Plaintiff has raised the following issues for review:

(1)      Whether the ALJ erred in failing to consider the entire record when evaluating the Plaintiff's impairments;

(2)      Whether the ALJ erred in failing to give appropriate weight to the opinions of Plaintiff's treating physicians, Drs. Rizvi and Supan; and

(3)      Whether the ALJ's erred in finding the Plaintiff was not a credible witness.

[Doc. No. 16 at 5].

## Review of Evidence

### *Plaintiff's Age, Education, and Past Work Experience*

At the time of the ALJ's decision, Plaintiff was forty-seven years old, had a high school equivalency degree, and had completed nursing school (Tr. 74, 79, 84).  She had past work experience as a licensed practical nurse and supervising nurse from 1990 through November 2002 (Tr. 69, 79).

### *Medical Evidence Pertaining to Disability*

A description of the medical evidence relied upon by the Commissioner [Doc. No. 22 at 3-14] and the Plaintiff [Doc. No. 16 at 2-5] follows.  Plaintiff saw Dabir A. Siddiqui, M.D. on February 21, 2000 (Tr. 131-33), and he diagnosed her impairments as "most likely chronic motility disorder and spastic colon in an irritable bowel type situation" (Tr. 132).  Previous tests were apparently negative, so he scheduled additional tests and expected to prescribe a treatment regimen if she, in fact, had irritable bowel syndrome ("IBS") (Tr. 133).  A subsequent gastric emptying study had normal findings, and there is no indication Dr. Siddiqui prescribed treatment for IBS (Tr. 134-

39). A few months later, in May 2000, Maureen Aaron, M.D., Plaintiff's primary care physician, reported improving diarrhea and a twelve-pound weight gain (Tr. 336). Dr. Aaron wrote Plaintiff had "probable spastic bowel syndrome" and intended to call Dr. Siddiqui (*id.*).

In February 2001, Plaintiff complained to Dr. Aaron of left arm pain, and she referred her for an MRI, which showed a normal cervical and lumbar spine (Tr. 291-92, 334). Later that month, Dr. Aaron observed Plaintiff smoked too much, still weighed too much at 196.5 pounds, and took too much pain and nerve medication (Tr. 334).

Three months later, in May 2001, Lawrence Winikur, M.D., examined Plaintiff on referral from Dr. Aaron (Tr. 287-89). Plaintiff denied any bowel or bladder incontinence (Tr. 287). Her past medical history included IBS, morbid obesity, bone tumor of the left humerus, a hysterectomy, and hypertension (*id.*). Plaintiff was smoking two to three packs of cigarettes per day (Tr. 287). Dr. Winikur noted Plaintiff's mid-lumbar pain was probably not coming from her back because her MRIs were negative and she had no radiculopathy (Tr. 288). He suspected she probably had bilateral sacral ileitis and injected her sacroiliac ("SI") joints for diagnostic purposes (*id.*). After Plaintiff reported the SI joint injections had not helped, in June 2001, Dr. Winikur performed diagnostic lumbar facet joint injections, noting there was no therapy he could offer if the injections did not work (Tr. 285). Plaintiff stated the lumbar facet blocks had given her two pain-free weeks (Tr. 283). In July 2001 Dr. Winikur performed lumbar facet median nerve branch blocks to further classify her pain and establish her candidacy for radio frequency ablation (Tr. 283). On August 6, 2001, Dr. Winikur performed a lumbar facet radio frequency procedure on Plaintiff's right side (Tr. 269-70).

On August 11, 2001, Plaintiff went to the emergency room complaining of a possible stroke,

citing numbness on her right side; trouble with speaking, thinking, seeing, and balancing; and minimal slurred speech (Tr. 251). Plaintiff reported a history of IBS, osteoporosis, chronic obstructive pulmonary disease ("COPD"), bronchitis, arthritis, smoking up to two packs of cigarettes per day, and recent foot surgery, but she did not report Dr. Winikur's recent procedure (*id.*). Examination by Philip L. Levin, M.D., was normal other than mild drift in her right arm and mild weakness in her right leg on straight leg raising (Tr. 252). A CT scan showed no bleeding; and chest x-rays showed normal lungs, heart, and bony structures (Tr. 251-52, 263, 268). Gordon M. Green, M.D. noted he did not know if Plaintiff's slightly slurred speech was normal for her, his examinations were normal, and Plaintiff may have had a small stroke (Tr. 256-57). Dr. Green kept her for a 23-hour observation, and Dr. Aaron later recorded that the 23-hour observation did not reveal any problems (Tr. 256, 331).

Later that month, on August 31, 2001, Plaintiff told Dr. Winikur her right side pain was minimal, while the pain on her left side was intense, and she did not relate any other problems since their last visit (Tr. 242). Dr. Winikur performed radio-frequency denervation on Plaintiff's left side (Tr. 242-43). The next day, on September 1, 2001, Plaintiff went to the emergency room complaining of numbness on her left side and reported having a "mini-stroke" on August 6, 2001 (Tr. 227, 231). Examinations by both David O. Lewis, M.D. and Shubhangi Chumble, M.D. were normal, other than an infection in one of her feet and some pinprick sensation deficit (Tr. 227, 233). A CT scan was also normal and unchanged from her CT scan from a few weeks earlier (233-34). Dr. Chumble suspected stress as a possible cause of her symptoms and recommended discharge with instructions to hydrate and reduce her stress (Tr. 234). Dr. Lewis primarily suspected hysterical conversion reaction, but also considered she could have been malingering or had an internal capsule

infarction (Tr. 236). He discharged Plaintiff with instructions to follow up with Drs. Aaron and Chumble (Tr. 236).

Later in September 2001, Dr. Aaron signed Plaintiff's disability form and noted her diarrhea was "not that bad," Plaintiff was on a lot of medication, and, despite her allegations of numbness, the hospital visits "did not reveal any problems" (Tr. 331). Also in September 2001, Plaintiff complained to J.G. Cargill, M.D. of urinary incontinence for the previous year. Physical examination revealed no physical or mental abnormalities (Tr. 141-44). An urodynamics test revealed normal bladder compliance, no signs of uninhibited contractions, and no incontinence while lying, sitting, or standing (Tr. 145). In October 2001, Dr. Winikur examined Plaintiff and diagnosed bilateral sacroilitis (Tr. 226). He noted a concern about the genuineness of Plaintiff's pain complaints and stated he believed Plaintiff's disability application may be a "very strong motivating factor for her persistent pain" complaints (Tr. 225). He also noted Plaintiff had been coming to him with different complaints which were "quite out of the ordinary" (*id.*). On examination, Plaintiff had good neurologic status, was not weak, and walked with a normal gait (Tr. 226).

In December 2001, Dr. Cargill performed surgery to repair defects related to urinary incontinence (Tr. 146-57). Pre-surgery work-up included chest x-rays showing no evidence of cardiopulmonary disease (Tr. 154). A month later, in January 2002, Plaintiff complained to Dr Aaron of right shoulder pain and weight loss down to 171.4 pounds, and stated that she either vomited her food or had diarrhea, but Dr. Aaron opined that she did not look bad (Tr. 335). Later in January 2002, Plaintiff went to the emergency room complaining of left thigh pain and decreased vision and reported a history of IBS (Tr. 218-21). Physical examination was largely normal except for tenderness in her left groin and hamstring (Tr. 220). Dr. Lewis diagnosed acute muscle strain

9

of the left groin and hamstring and discharged her with pain medication (Tr. 220).

In February 2002, state agency medical and psychological consultants reviewed the record. A mental status review was performed by Julie Jennings, PhD.,who opined Plaintiff's affective disorder was not severe, because it only caused mild limitations (Tr. 159-72). Dr. Jennings observed Plaintiff had no history of treatment from a mental health professional, her hospital visits recorded no psychiatric abnormalities, and a physician believed her complaints were motivated by a desire for disability benefits (Tr. 171). A physical RFC assessment was done by Richard Surrusco, M.D. who opined that Plaintiff could sit and stand and/or walk six hours each, and lift fifty pounds occasionally and twenty-five pounds frequently in an eight hour day (Tr. 175). Dr. Surrosco noted Plaintiff's February 2001 MRI was negative, and his treatment notes recorded normal gait, strength, and reflexes (Tr. 176).

On February 18, 2002, Plaintiff complained to Dr. Aaron of right shoulder pain, nausea, vomiting, and weight loss (Tr. 335). Dr. Aaron observed that Plaintiff walked well and could work night shift and third floor work (*id.*). The next month, Plaintiff reported to Dr. Aaron that she was back at work and had gained weight, but her shoulder still hurt (*id.*). In April 2002, an MRI suggested a "minimal tear of the distal supraspinatus tendon" in Plaintiff's right shoulder consistent with degenerative arthritis of acromioclavicular joint (Tr. 207, 338).

Also in April 2002, Plaintiff went to the hospital complaining of chest pain and stated she had severe whole body pain from fibromyalgia (Tr. 208). Plaintiff's physical examination was mostly normal, x-rays showed no acute process, but some atelectasis; and, an EKG showed no abnormalities other than tachycardia (Tr. 210-11, 217). Thomas W. Shields, M.D. diagnosed exacerbation of fibromyalgia and discharged Plaintiff with pain medication (Tr. 211).

In June 2002, Dr. Aaron listed Plaintiff's impairments as COPD, back problems, IBS, chronic depression, and fibromyalgia (Tr. 332). Dr. Aaron also noted Plaintiff weighed 166.2 pounds and smoked two packs of cigarettes per day (Tr. 332).[2]

From July 31 to August 4, 2002, Plaintiff went to the emergency room three times for separate complaints, met with different doctors, and received medication each time (Tr. 183-205). On her first visit, she complained a fibromyalgia flare-up was causing back pain and reported a history of IBS and degenerative arthritis (Tr. 201). Physical examination showed no abnormalities, but a urinalysis showed infection (Tr. 202-03). Jose Mier, M.D. diagnosed acute pyelonephritis, non-complicated, and acute fibromyalgia exacerbation and discharged her (Tr. 204). Two days later, Plaintiff complained she fell out of bed onto her right shoulder causing severe pain and she reported a history of fibromyalgia, COPD, degenerative arthritis of the shoulder requiring surgery, a urinary tract infection, and smoking one pack of cigarettes per day (Tr. 194). X-rays showed no bone or rib fractures and pulse oximetry showed 95% (Tr. 195-96, 199). Keith Nichols, M.D. diagnosed Plaintiff with a bruised right shoulder, COPD, a recent urinary tract infection, and discharged her (Tr. 196).

On August 4, 2002 Plaintiff reported having a stroke that evening with severe frontal headache, right hand numbness, and gait disturbance (Tr. 187-93). Plaintiff also reported she had not previously had those symptoms (Tr. 187). Her physical examination and CT scans showed no abnormalities (Tr. 187-89, 193). Edna Ekuban-Gordon, M.D. diagnosed Plaintiff with an acute neurological event, transient ischemic attack; a history of fibromyalgia, hypertension, and COPD

---

[2] As pointed out by the Commissioner, an examination report which does not appear to involve an examination of the Plaintiff is included in the administrative record (Tr. 384). It does not appear that the ALJ relied on this report as it is not explicitly discussed in his decision.

(Tr. 189). Dr. Ekuban-Gordon wrote a note excusing Plaintiff from work for two days and discharged her (*id.*).

On September 25, 2002, Plaintiff reported to Dr. Aaron she was having multiple problems with her stools, bowels, blackout spells, and weight loss (Tr. 332). Dr Aaron noted a belief Plaintiff was wearing diapers (Tr. 332). Dr. Aaron observed Plaintiff looked better due to her weight loss and noted "Physically I could not find a whole lot wrong [with Plaintiff]." (Tr. 332). Dr. Aaron arranged a neuropsychological consult and thought Plaintiff should probably apply for long-term disability (Tr. 330). On October 25, 2002, Dr. Aaron noted Plaintiff had gone through the first part of her neuropsychological tests, but needed more tests (Tr. 330).

In November 2002, Dr. Aaron saw Plaintiff on a walk-in basis after Plaintiff had a fight with her husband and observed that Plaintiff was on too many medications and appeared to be in a decompensated state, probably from her medication (Tr. 330). She sent Plaintiff to the hospital for evaluation of her fibromyalgia, pain, depression, and sadness, and felt her problems were more psychiatric than physical (Tr. 158, 293, 325, 330). While checking in to the hospital Plaintiff stated she could not take the pain anymore (Tr. 300, 325). Keshavpal Reddy, M.D. discharged her after three days with the diagnoses of major depression without psychotic features, post-traumatic stress disorder and a GAF of 40/60 (Tr. 158, 293-95). Dr. Reddy reported Plaintiff had gained maximum inpatient benefit and would return to work within two weeks (Tr. 293-95). Dr. Aaron again saw Plaintiff on December 13, 2002 noting Plaintiff had been taken off some of her medicines but was no better (Tr. 329). Dr. Aaron described Plaintiff as a "histrionic lady who really cannot work anymore" and noted Plaintiff's husband wanted her to quit work (*id.*).

On December 26, 2002, Dr. Aaron reported Plaintiff walked pretty well, her abdomen was

12

benign, her stool was negative, her diarrhea was perhaps a little better and her weight was stable (Tr. 329). Dr. Aaron opined that Plaintiff had multiple physical ailments, but her psychiatric problem seemed paramount and that it was "really, really difficult to know how sick" Plaintiff was (*id.*).

The following month, in January 2003, Dr. Reddy filled out a questionnaire for Plaintiff's disability application (Tr. 341-45). Dr. Reddy observed Plaintiff could perform activities of daily living and opined as to specific areas of mental functioning, but did not feel he had seen her enough to opine as to whether she was disabled (Tr. 345).

In February 2003, Douglas Eglin, LCSW reported he had seen Plaintiff for outpatient counseling a few times since November 2002 (Tr. 346-47). Mr. Eglin recounted Plaintiff's physical complaints and discomfort working with 60 AIDS patients at her former job at a nursing home, and expressed doubt that Plaintiff could return to her former job (Tr. 346-47).

In March 2003, Dr. Aaron observed Plaintiff had some weight gain and looked "fairly good" (Tr. 349). Plaintiff's affect was flat, however, and Dr. Aaron commented she had a protracted course of depression and was not functioning well (Tr. 349).

In April 2003, state agency medical and psychological consultants reviewed the record and opined Plaintiff could perform light work. Dr. Donald R. Williams, M.D. reviewed the evidence and completed an assessment of Plaintiff's physical RFC on April 24, 2003 (Tr. 351-58).[3] Based upon the evidence he reviewed, Dr. Williams opined Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours out of an eight-hour workday; and sit for about six hours out of an eight-hour workday (Tr. 352). Dr. Williams also

------

[3] The signature page of Dr. Williams' RFC assessment does not appear in the original administrative record filed by the Commissioner. The Commissioner filed the signature page (Tr. 358) as a Supplemental Transcript of the administrative record [Doc. No. 23].

indicated his RFC assessment significantly differed from those of the Plaintiff's treating sources, especially Dr. Aaron's assessment that Plaintiff could not work anymore (Tr. 357). Dr. Williams indicated there was no evidence which would preclude Plaintiff from physically engaging in work activity and she had an RFC for light work (*id.*).

Eugene Hamilton, PhD. completed a psychiatric review technique form on April 28, 2003 (Tr. 359-72). He opined Plaintiff had major depression, recurrent, severe, without psychotic features, which caused mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence, or pace; and one or two episodes of decompensation (Tr. 362, 369). Dr. Hamilton opined Plaintiff's current mental status was normal and that Dr. Reddy indicated Plaintiff had a higher level of functioning than she claimed (Tr. 371). Dr. Hamilton opined Plaintiff had the functional capacity to perform non-stressful simple unskilled competitive work, although she could not return to her work in a nursing home (Tr. 375).

In June 2003, Plaintiff began outpatient mental health treatment with Andi Stanford, MSSW and Dr. A. Supan following separation from her husband and her mother's death in April (Tr. 406-07). At intake, they opined Plaintiff had major depression, a current GAF score of 50 and was moderately impaired (Tr. 403-05). Monthly, from June through September 2003, Dr. Supan recorded no significant problems, except for depression, which improved (Tr. 395-98).

In September 2003, Plaintiff drove herself to the Erlanger emergency room complaining of sinus congestion, abdominal pain, and urinary frequency, but denied diarrhea or constipation (Tr. 431-434). Plaintiff reported a past history of fibromyalgia, asthma, tachycardia, and inflammatory bowel disease, but told the staff she had no history of surgery (Tr. 431). Plaintiff had normal breathing and lab tests showed a urinary tract infection (Tr. 431-32). John Galbraith, M.D. read the

x-rays, which showed a normal abdomen with evidence of gallbladder removal (Tr. 432, 437).

Later in September 2003, Plaintiff checked herself into the hospital reporting suicidal ideations (Tr. 378). She told the staff that her mother committed suicide in April 2003, her uncle and cousin died within the past year, she was recently separated from her husband, and she had significant financial difficulties (Tr. 378-79). She was diagnosed with major depression and a GAF at admission of 20-31 (Tr. 379). She was discharged six days later in stable condition with a GAF of 51 (Tr. 380). Plaintiff denied any further suicidal ideations (Tr. 380).

From October 2003 through March 2004, Dr. Supan recorded improved symptoms in Plaintiff's treatment notes, and in January 2004 reported she showed signs of improvement (Tr. 389-94, 471). Also, in January 2004, Dr. Supan completed an assessment of Plaintiff's mental limitations (Tr. 468-71). Dr. Supan opined that Plaintiff's abilities ranged from poor to fair, she had memory problems since her reported mild strokes in 2001 and 2002 and sometimes just laid in bed (Tr. 471). He also indicated Plaintiff's condition remained fragile (Tr. 471). Two months later, in March 2004, Dr. Supan indicated Plaintiff was mildly impaired and had a GAF of 55 (Tr. 386-88).

In November 2003, Plaintiff went to the emergency room complaining of abdominal pain (Tr. 415-25). Plaintiff repeatedly asked to go smoke (Tr. 415, 419). CT scans showed a normal pelvis and abdomen, blood tests were mostly unremarkable, and she displayed normal behavior and affect (Tr. 418, 420-25). Plaintiff was discharged that day (Tr. 417).

In December 2003, Plaintiff went to the emergency room by ambulance complaining of headaches and seizure activity (Tr. 409-13). She left her room to go smoke without permission and was repeatedly prevented from leaving again (Tr. 411). She was discharged the same day with a diagnosis of seizure disorder (Tr. 411).

In December 2003, Naushaba Rizvi, M.D. became Plaintiff's primary care physician and noted her past medication and diagnoses (Tr. 486). Over the next few months, Plaintiff complained of "'excruciating' fibromyalgia pain," "IBS symptoms," pain all over her body, and swollen feet (Tr. 478-86).

In February 2004, Plaintiff underwent vaginal surgery at Erlanger Health System (Tr. 427-29, 454-56). John Galbraith, M.D. took chest x-rays during pre-op because of her cough (Tr. 430). X-rays showed minimal linear fibrosis, with no evidence of any heart or pulmonary disease (Tr. 430).

In February 2004, Plaintiff went to Stephen Dreskin, M.D., for pain management (Tr. 448-51). Dr. Dreskin's examination did not disclose any abnormalities and showed that Plaintiff had a full range of motion (Tr. 450). Dr. Dreskin's impression was: fibromyalgia; osteoarthritis; osteoporosis; depression, anxiety and insomnia; obesity and deconditioning; hypertension; and COPD, tobacco (*id.*). Dr. Dreskin reported that if he were to treat Plaintiff, he would begin with non-narcotic medicine, he recommended dietary changes and physical therapy, and he wished to review her previous MRIs (Tr. 451).

In March 2004, Dr. Rizvi completed a medical opinion form (Tr. 439-41). Dr. Rizvi opined Plaintiff could sit and stand or walk two to three hours each, for no more than a half hour at a time in an eight-hour day (Tr. 439). Dr. Rizvi also opined Plaintiff could lift no more than twenty pounds infrequently, ten pounds, occasionally, and five pounds frequently (Tr. 439). Dr. Rizvi further suggested significant restrictions to Plaintiff's abilities to bend, reach, concentrate, and work without rest, and opined the belief Plaintiff could not work a forty-hour work-week (Tr. 439-41).

In April 2004, Laura Witherspoon, M.D. surgically removed a mass from Plaintiff's breast

(Tr. 491). A biopsy showed that the mass was not a tumor but benign tissue (Tr. 492). In June 2004, Dr. Supan recorded that Plaintiff reported doing worse (Tr. 473).

On July 8, 2004, Plaintiff went to Y. Charles Han, M.D., Ph.D. for back and neck pain evaluation (Tr. 503-505). Plaintiff had a full range of motion, normal muscle tone and bulk, motor strength, and reflexes, and a negative straight leg raising exam, so Dr. Han ruled out radiculopathy (Tr. 503-04). Plaintiff displayed focal tenderness in her lumbar facet joints and expressed pain while bending or stretching (Tr. 504). Dr. Han had not seen her MRI's but believed the back pain was related to lumbar facet joint syndrome and extensive disk degeneration (Tr. 504). Dr. Han performed steroid injections and prescribed narcotic medication (Tr. 504). At Plaintiff's request, Dr. Han increased the narcotic dosage later in July and September 2001 (Tr. 501-02).[4]

In September 2004, Ken Kozawa, M.D., performed a colonoscopy and associated procedures (Tr. 494). The examination was unremarkable, though difficult because there was significant stool in her system, and Dr. Kozawa's impression was questionable bile reflux (Tr. 494).

### Plaintiff's Hearing Testimony

On July 8, 2004, Plaintiff testified she was separated from her husband, but had their jointly owned automobile, which she drove only to Doctor's appointments and the pharmacy (Tr. 523-24). She lived with her oldest son, his wife and their seven-year-old child (Tr. 523).

Plaintiff testified she took care of her room, occasionally fixed herself something simple to eat, watched TV, and read books (Tr. 524). She testified that she could not work or go out often

---

[4] At the July 8, 2004 hearing, Plaintiff requested the record remain open because she had a scheduled appointment with Dr. Han (Tr. 538-39). The ALJ agreed the administrative record would be kept open (Tr. 540). Subsequently, Plaintiff submitted Dr. Han's treatment notes to the ALJ in October 2004 and they were made part of the administrative record (Tr. 500-05).

17

because of fibromyalgia, arthritis, and IBS with incontinence (Tr. 526). Plaintiff testified she had eight to ten bouts of diarrhea on a good day, while a bad day was twenty-five to thirty bouts of diarrhea; she had only one good day every two weeks (Tr. 527, 533). She stated Dr. Risby [sic] had prescribed various medications for her diarrhea, but they did not affect it (Tr. 527).

Plaintiff testified that her foot tumors had returned on her left foot, which made it difficult to walk (Tr. 528-29). Plaintiff testified that, after she asked for a wheelchair, Dr. Risby [sic] ordered an electric wheelchair for her but TennCare would not pay for it (Tr. 529-30). She testified that Dr. Risby [sic] told her she was going into congestive heart failure (Tr. 531).

## Analysis

Plaintiff argues the ALJ's findings that she could perform a broad range of light unskilled work is wholly unsupported by the evidence [Doc. No. 16 at 5]. She argues the ALJ erred in according considerable weight to the opinions of the state agency consultants, who never physically examined her, rather than the opinions of her treating physicians [*id.* at 5-6]. Plaintiff also argues the ALJ improperly discounted her subjective complaints of severe pain and ignored the consistent diagnosis of fibromyalgia in the record [*id.* at 6]. Plaintiff asserts "the ALJ believes that his knowledge of medical conditions and treatment regimens [and] their relative symptoms is superior to that of practicing treating medical physicians, and as such, the ALJ made his ruling upon his own perceived medical expertise." [*id.*].

### Treating Source Regulation

Plaintiff argues the ALJ erred in not according controlling weight to the opinions of her treating physicians, Drs. Rizvi and Supan. Although a treating physician's opinion typically is entitled to substantial deference, as argued by Plaintiff, the ALJ is not bound by that opinion.

*Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). The Sixth Circuit has consistently stated that the treating physician's opinion is entitled to deference only if it is based on objective medical findings, *see, e.g.*, *Warner*, 375 F.3d at 390; *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993), *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985), and not contradicted by substantial evidence to the contrary. *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987). If the ALJ finds the treating physician's opinion is not supported by objective evidence, the ALJ is entitled to discredit the opinion as long as he sets forth good reasons for doing so. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004); *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Sixth Circuit also has held that the opinion of a treating physician generally is entitled to greater weight than the contrary opinion of a consulting physician who has examined the claimant on only a single occasion. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997); *Hardaway*, 823 F.2d at 927. The responsibility for weighing the record evidence, including conflicting physicians' opinions, and resolving the conflicts rests with the ALJ. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). The ALJ may reject unsupported opinions or opinions inconsistent with other substantial evidence in the record. *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). *See also* 20 C.F.R. §§ 404.1527(d) and 416.927(d).

The first issue to be considered by a reviewing court regarding the ALJ's application of the treating source regulation is whether there is substantial evidence to support the ALJ's decision to not give controlling weight to the opinion of the treating physician. *See* 20 C.F.R. §§ 404.1527(d) and 416.927(d). If the ALJ properly found the treating physician's opinion was not entitled to controlling weight, the next consideration is whether he appropriately applied the following factors

in determining how much weight to give the treating physician's opinion: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source . . . ." *Wilson* v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). The next issue for consideration is whether the ALJ applied the correct legal standard in deciding how much weight to accord each doctor's opinion under the criteria set forth in 20 C.F.R. §§ 404.1527(d) and 426.927(d). Finally, even where a reviewing court finds that substantial evidence supports the ALJ's decision not to give controlling weight to a treating physician's opinion, the agency regulations require the ALJ to give "good reasons" for that decision. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).

The ALJ explained his treating physician findings as follows:

> Naushaba Rizvi, M.D., saw the claimant twice, in 2002, and became the claimant's primary care physician, in December 2003. The claimant consistently reported pain all over her body, which Dr. Rizvi related to fibromyalgia at least once. A lower extremity EMG test and bilateral knee x-rays were normal. The claimant mentioned diarrhea once, at an outpatient clinic, together with nausea and vomiting, in May 2003. Based on Dr. Aaron's and Dr. Rizvi's treatment notes, however, diarrhea has not been a problem since March 2003 . . . .
> . . .
> The claimant began outpatient mental health treatment with psychiatrist A. Supan, M.D., in June 2003. Dr. Supan continued to see the claimant, in 2004, and assessed major depressive disorder. The claimant reported that nervousness and irritability were making her diarrhea worse in July 2003. Dr. Supan made several medication changes, in 2003, with some improvement. However, the claimant was hospitalized for psychiatric evaluation, in September 2003, after the death of several family members. Major depressive disorder, recurrent, severe, and mixed substance abuse were diagnosed. A GAF of 51 was assigned at discharge, which again reflects moderately impaired functioning. Although the urine drug screen showing unconfirmed positive for benzodiazepine and opiates was

20

included, substance abuse was not mentioned anywhere else in the September 2003 inpatient report, or indeed in the claimant's whole medical record . . . .

Dr. Supan found the claimant somewhat improved in October 2003. The claimant's main complaint was sleep disturbance, in November 2003, although chronic pain and diarrhea were also mentioned. The claimant continued to improve in early 2004, feeling much better and much calmer with her medication. A GAF of 55, reflecting moderately limited functioning, was assigned, in March 2004.

Pursuant to Social Security Ruling 96-6p, I have considered the findings of fact made by state agency expert review consultants regarding the nature and severity of the claimant's impairments. State agency review physicians found physical limitations consistent with light work activity. State agency mental health review consultants determined the claimant was limited to simple, unskilled work, due to her affective disorder. I have accorded these findings considerable weight in this claim because they are consistent with the clinical and laboratory findings and with the treatment documentation.
. . .
Further exertional limitation, such as suggested by Dr. Rizvi, in her opinion of March 2004, is not supported by Dr. Rizvi's own treatment notes or by other objective medical evidence. Dr. Rizvi indicated the claimant cannot sit or stand/walk more than three hours each in an eight-hour workday and requires one to two hours of bedrest during a normal workday. Dr. Rizvi noted several other nonexertional limitations, which appear to be based on the claimant's subjective complaints with little consideration for the objective evidence for such limitations. Therefore, I find Dr. Rizvi's opinion to be unsupported by substantial evidence, and due little weight. Dr. Aaron's notation, in November 2002, that the claimant cannot work anymore can be related at least in part to the skill and responsibility required in the claimant's last job. However, Dr. Aaron's further comment that the claimant's husband did not want her to work diminishes the medical objectivity of the statement, so that I give Dr. Aaron's statement little weight as well.
. . .
Under the "B" criteria, I find the evidence supports a conclusion the claimant would experience no more than mild difficulty engaging in daily activities due to the effects of depression. The claimant alleged difficulty primarily with chronic pain. Her depression may cause moderate difficulty maintaining appropriate social interaction. This

21

level of limitation is suggested primarily by Dr. Supan's medical source statement that the claimant had some vegetative signs of depression. With the exception of this statement, there is little evidence or allegation of more than mild difficulty interacting socially. Furthermore, Dr. Supan's GAF assessment of 55, in March 2004, reflects improvement in the claimant's mental state since September 2003, when her GAF assessment was 51. Although Dr. Supan noted "vegetative symptoms" in her medical source statement, from January 2004, her treatment notes do not document such difficulty. Indeed, her January 2004 visit note indicates the claimant was doing well most of the time. Given the claimant's difficulties, in 2002, and early in her treatment with Dr. Supan, it appears that depression caused moderate difficulty maintaining concentration, persistence, and pace. Dr. Supan rated this aspect of functioning as fair or "usually satisfactory," along with her ability to perform daily activities and complete tasks timely . . . .
. . .
The psychological evidence does not suggest the claimant has any significant restrictions in her ability to meet the mental demands of unskilled work activity. I give some weight to Dr. Supan's assessment . . . which suggested satisfactory functioning in several areas. Her narrative account of the claimant's condition seems more dramatic than his treatment notes reflect. Furthermore, he left unrated many specific aspects of work-related functioning. I give greater weight to the GAF assessments made by Dr. Reddy, in November 2002, and by Dr. Supan, in March 2004, which reflect only moderately impairment [sic] functioning. Dr. Reddy's medical source statement indicates several areas of fair functioning, which appears consistent with the GAF scores noted and an ability to meet the mental demands of unskilled work. I give this opinion considerable weight.

(Tr. 16-20) (internal citations omitted).

The Court concludes the ALJ followed the appropriate steps in deciding not to give controlling weight to the opinions of Plaintiff's treating physicians. *See Wilson*, 378 F.3d at 544. The ALJ applied the correct legal standard to weigh the opinions of the acceptable medical sources, including the opinions of Drs. Rizvi and Supan and the state agency medical sources, as required by applicable regulations, and appropriately resolved inconsistencies between the acceptable

22

sources. *See* 20 C.F.R. §§ 404.1527(d)(4), (f)(2)(i) and 416.927(d)(4), (f)(2)(i); *Mullins v. Sec'y of Health & Human Servs.*, 836 F.2d 980, 984 (6th Cir. 1987) ("Claimant's argument rests solely on the weight to be given opposing medical opinions, which is clearly not a basis for our setting aside the ALJ's factual findings."). The ALJ did not label the exact amount of weight given each opinion or list how he applied each of the factors in 20 C.F.R. § 404.1527(d) to explain his conclusion, but his decision shows application of the regulatory framework and a thorough review of the evidence.

The ALJ's decision also adequately explains why he refused to give controlling weight to the opinions of Drs. Rizvi and Supan. The ALJ explained he did not give Dr. Rizvi's opinion significant weight because it was not supported by Dr. Rizvi's treatment notes or by other objective medical evidence, but instead appeared to be based on Plaintiff's subjective complaints with little objective evidence for such limitations (Tr. 19). An "ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.'" *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (quoting *Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992)). As the ALJ found, the basis for Dr. Rizvi's opinion was not explained, nor did Dr. Rizvi set forth any clinical test results which demonstrated Plaintiff was limited to such an extent. The objective medical evidence of record is inconsistent with such limitations as Plaintiff's tests were consistently negative for any significant abnormalities. Further, Dr. Aaron, also Plaintiff's long-time treating physician, recorded in September 2002 that physically she "could not find a whole lot wrong." (Tr. 332).

Plaintiff cites to no specific objective evidence to support Dr. Rizvi's opinion [Doc. No. 16 at 8-9]. Instead, she argues because fibromyalgia cannot be confirmed by objective medical evidence, the ALJ erred in discounting Dr. Rizvi's opinion [*id.* at 9]. The mere diagnosis of

fibromyalgia, however, is not enough to establish disability, as most cases of fibromyalgia are not disabling. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (noting that most people with fibromyalgia are not totally disabled from working). In *Preston v. Secretary of Health and Human Services*, 854 F.2d 815, 820 (6th Cir. 1988) (per curiam), the Sixth Circuit noted the plaintiff's treating physician satisfied the standard set forth in *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 851-52 (6th Cir. 1986), which requires objective medical evidence to confirm the severity of the pain arising from an underlying medical condition when he systematically eliminated diagnoses other than fibromyalgia, identified focal tender points, and observed additional classic symptoms of fibromyalgia. Dr. Rizvi's notes, however, do not record the presence of trigger points or discuss the severity of Plaintiff's fibromyalgia. Moreover, none of the physicians of record who diagnosed fibromyalgia either identified focal tender points or observed the additional classic symptoms of fibromyalgia.

With regard to Dr. Supan's opinion, the ALJ found the medical evidence suggested Plaintiff suffered from some mental impairment at least since 2001 (Tr. 17). The ALJ observed Plaintiff began seeing Dr. Supan in June 2003 and continued to see her in 2004 (*id.*). During 2003, the ALJ noted Plaintiff's mental condition improved based upon changes in medicine made by Dr. Supan, but Plaintiff was hospitalized in September 2003 for a psychiatric evaluation following the death of several family members (*id.*). Nevertheless, the ALJ found upon discharge Plaintiff was assigned a GAF of 51, suggesting moderately impaired functioning (*id.*). The ALJ also noted that from October 2003, through early 2004, Plaintiff continued to improve and in March 2004 Plaintiff was assigned a GAF of 55, again reflecting moderately limited functioning (Tr. 18).

In weighing Dr. Supan's reports, the ALJ stated Dr. Supan recorded "vegetative symptoms"

in the January 2004 medical source statement, but the assignment of a GAF of 55 in March 2004, suggested improvement (Tr. 20). Thus, the ALJ gave some weight to Dr. Supan's assessments (*id.*). The ALJ also gave greater weight to the GAF assigned to Plaintiff by Dr. Reddy in November 2002 and by Dr. Supan in March 2004, both of which reflected moderately impaired functioning (*id.*). Thus, contrary to Plaintiff's suggestion, the ALJ did not totally discount Dr. Supan's opinion. The ALJ accorded greater weight to Dr. Supan's most recent GAF score for Plaintiff and only rejected the more severe limitations set forth by Dr. Supan as inconsistent with the other medical evidence of record. The ALJ's finding did significantly restrict Plaintiff's RFC from a mental standpoint to unskilled work from the skilled nursing work she previously performed.

The ALJ also explained his reasoning for according considerable weight to the opinions of the state agency medical consultants (Tr. 18). The ALJ concluded the opinions of the state agency reviewers should be accorded considerable weight because they were consistent with the clinical and laboratory finding and the treatment notes (*id.*). Thus, the Court concludes the ALJ did not err in assessing the medical opinions of record, including the opinions of Drs. Rizvi and Supan and the opinions of the state agency medical consultants.

Plaintiff also contends the ALJ substituted his own opinion as to her condition for the opinions of her physicians [Doc. No. 16 at 6, 10]. Plaintiff identifies no situation where the ALJ substituted his own opinion for those of a medical expert, but claims the ALJ "considered the [Plaintiff's] reports of daily activities to 'reflect significant somatic complaints and self limitation rather than a reasonable level of restrictions for the impairments established by the objective record.'" [Doc. No. 16 at 10, citing (Tr. 19)]. Yet, in the only example cited by Plaintiff, the ALJ's statement does not deal with an opinion of a treating, consulting, or reviewing physician or other

25

medical evidence. Instead, the ALJ discusses Plaintiff's report(s) of her activities of daily living. Although Plaintiff complained the ALJ ignored the consistent diagnosis of fibromyalgia in the record, the ALJ found the Plaintiff suffered from severe impairments "including, fibromyalgia, lumbar facet syndrome, degenerative joint disease of the right shoulder, and major depressive disorder." (Tr. 15). While the ALJ did not ignore the diagnosis of fibromyalgia, he found the medical evidence of record did not support Plaintiff's subjective claims as to the severity of the pain she experienced from her fibromyalgia. Likewise, the ALJ did not deny diarrhea was mentioned in the medical evidence of record, he simply found the objective medical evidence of record did not document the severity of Plaintiff's complaint, *i.e.*, that her IBS resulted in 25 to 30 bowel movements daily in 13 days out of every 14-day period (Tr. 18). Contrary to Plaintiff's contentions, this does not constitute the ALJ substituting his opinion for the opinions/assessments of the physicians whose medical reports are in the administrative record; rather, the ALJ decided how much weight/credibility to accord the physician's opinions/assessments and also factored the information into his credibility determination.

### *Credibility*

Plaintiff challenges the ALJ's credibility finding. She asserts the ALJ failed to give proper consideration to her complaints of severe pain and also discounted the consistent diagnosis of fibromyalgia in the record [Doc. No. 16 at 6]. Plaintiff contends the record provides ample evidence of underlying medical conditions which could reasonably produce the pain she claims to experience (*id.*).

Regarding subjective complaints of pain, a claimant's self-reported claims of disabling pain are not, standing alone, sufficient to establish disability. *See* 20 C.F.R. §§ 404.1529(a) and

416.929(a). First, such claims must be supported by objective medical evidence (*i.e.*, medical signs and/or laboratory findings) of an underlying medical condition and, second, either (1) the objective medical evidence must confirm the severity of the alleged pain, or (2) the objectively established medical condition must be of such a severity that it can be reasonably expected to produce the alleged pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); 20 C.F.R. §§ 404.1529(a) and 416.929(a). Finally, the intensity and persistence of the claimant's symptoms must be evaluated to determine whether those symptoms limit the claimant's capacity for work. 20 C.F.R. §§ 404.1529(c)(1) and 416.929(c)(1). Relevant evidence for the ALJ's determination includes the claimant's medical history, statements by treating physicians, medications taken, medical treatment other than medication received to relieve pain or other symptoms, methods the claimant has used to relieve pain, precipitating and aggravating factors, daily activities, and statements by the claimant. 20 C.F.R. §§ 404.1529(c) and 416.929(c). Ultimately, it is the functional limitations imposed by a condition rather than the diagnosis itself which determines whether an individual is disabled. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).

Pain caused by an impairment can be disabling, but each individual has a different tolerance of pain. *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 367 (6th Cir. 1984). Thus, a determination of disability based on pain depends in part on the credibility of the claimant. *Id*.; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981). In determining credibility, the ALJ considers, among other things, whether there are any inconsistencies between the claimant's statements and the rest of the evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Because the ALJ is charged with the responsibility of observing the demeanor and credibility of the witness, his conclusions should be highly regarded. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th

Cir. 1997); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).

The ALJ considered a variety of relevant factors in assessing the overall nature and severity of the limitations produced by Plaintiff's impairments, symptoms, and complaints of pain in accordance with the evaluation factors as set forth in SSR 96-7p (Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements) and 20 C.F.R. §§ 404.1529 and 416.929. The ALJ discussed the reasons for his findings with respect to Plaintiff's subjective complaints of pain (Tr. 18-20). The ALJ concluded the objective medical evidence, Plaintiff's activities of daily living, and the "relatively mild to moderate pathology documented by the clinical examinations" did not demonstrate the degree of severity of limitations alleged by Plaintiff (Tr. 19). With regard to Plaintiff's fibromyalgia, the ALJ noted the record does not contain a specific assessment of the severity of the Plaintiff's fibromyalgia (Tr. 18). Moreover, the ALJ noted fibromyalgia was rarely mentioned by Plaintiff's treating sources (Tr. 18). As noted previously, Dr. Rizvi diagnosed fibromyalgia, but he never recorded the presence of trigger points, nor did he discuss the severity of Plaintiff's fibromyalgia.

Plaintiff further contends the ALJ erred in finding a discrepancy in her claim concerning the number of restroom breaks she reported as resulting from her IBS which diminished her credibility [Doc. No. 9-10]. Plaintiff asserts the ALJ cited no evidence that indicates the range of restroom breaks is actually less than the number to which she testified [*id.* at 9]. The ALJ reasonably found, however, the medical reports did not support Plaintiff's claim that her IBS resulted in twenty-five to thirty bowel movements daily in thirteen out of every fourteen days (Tr. 18). The ALJ noted although diarrhea is mentioned in the treatment notes, he found it unlikely such extreme diarrhea was not documented or reflected in the treatment notes (*id.*). Finally, the ALJ also found it unlikely

that if Plaintiff were experiencing diarrhea of such severity/frequency as she alleged, there was only one mention of a prescription for anti-diarrheal medication, in December 2002, but none thereafter (*id.*).

### Substantial Evidence

The ALJ reasonably weighed the evidence of record; and, the Court concludes substantial evidence supports the ALJ's finding that Plaintiff was not disabled because she retained the RFC to perform unskilled, light work. The ALJ's assessment of the limitations to Plaintiff's RFC is consistent with the findings and opinions of the physicians of record, except for Dr. Rizvi's limitations to the Plaintiff's ability to sit and stand/walk. As noted above, the ALJ explained his reasons for not according significant weight to Dr. Rizvi's opinion/assessment, for not finding Plaintiff's subjective complaints fully credible, and for finding Plaintiff had the RFC to perform light, unskilled work (Tr. 20).

An RFC assessment "considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments . . . ." *SSR* 96-8p, 1996 WL 374184, * 1. *See also Walters*, 127 F.3d at 531 (6th Cir. 1997) (claims of symptoms or pain must be supported by objective evidence of a medical condition of such severity it could reasonably be expected to produce such symptoms or pain). The ALJ found Plaintiff had "severe impairments" including fibromyalgia, lumbar facet syndrome, degenerative joint disease of the right shoulder and major depressive disorder (Tr. 15). Despite Plaintiff's assertion the ALJ did not properly consider her impairments, the ALJ did find these impairments caused significant limitation from both a physical and mental standpoint; namely, they limited her RFC to light, unskilled work (Tr. 15-20).

Further, the ALJ did determine Plaintiff's RFC in accordance with the regulations. The regulations, 20 C.F.R. § 404.1567(b) defines "light work" as:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities . . . .

The ALJ determined that an RFC for a full range of light work was consistent with all of the medical source evidence, except for the extreme limitations to Plaintiff's ability to sit and stand and/or walk set forth in Dr. Rizvi's March 2004 assessment (Tr. 19). Thus, the Commissioner's decision is supported by substantial evidence in the record.

## Conclusion

Having carefully reviewed the administrative record and the briefs of the parties filed in support of their respective motions, for the reasons stated above it is **RECOMMENDED**:[5]

(1)     Defendant's motion for summary judgment [Doc. No. 21] be **GRANTED**;

(2)     Plaintiff's motion for judgment on the pleadings [Doc. No. 15] be **DENIED**;

(3)     A Judgment be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure **AFFIRMING** the Commissioner's decision which denied benefits to the Plaintiff; and,

(4)     This action be **DISMISSED**.


s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[5] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).